Filed 3/8/21  Sujan v. Corona Regional Medical Center CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| SUNIL SUJAN et al., | |
| Plaintiffs and Respondents, | E071217 |
| v. | (Super.Ct.No. RIC1717505) |
| CORONA REGIONAL MEDICAL CENTER INC., et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Irma Poole Asberry, Judge.  Affirmed.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez; Nossaman, Carol Coppo and David M. Balfour for Defendants and Appellants.

Milstein Jackson Fairchild & Wade, Lee Jackson, Gillian L. Wade, Mayo L. Makarczyk; Kabateck Brown Kellner, Brian S. Kabateck, Anastasia K. Mazzella and Christopher B. Noyes for Plaintiffs and Respondents.

1

Plaintiff Sunil Sujan, a physician who formerly practiced medicine with defendant Corona Regional Medical Center (CRMC), filed this lawsuit alleging CRMC and three individual defendants (Alaa Afifi, M.D., Imdad N. Yusufaly, M.D., and Ahmed El-Bershawi, M.D.) engaged in a concerted scheme to defame him and ruin his professional reputation, and summarily suspended his admitting privileges. Defendants appeal the trial court's denial of their Anti-SLAPP[1] motions. The trial court concluded, and we agree, that: (1) four of Sujan's causes of action challenge his suspension and therefore do not arise from a protected activity; and (2) although Sujan's causes of action for defamation and intentional infliction of emotional distress (IIED) do arise from protected peer review activity, there is a probability Sujan will succeed on the merits of those claims. Therefore, we affirm.[2]

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.'" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

[2] Sujan's wife, Nita Patel, also sued alleging loss of consortium caused by defendants' acts and omissions toward Sujan. The trial court concluded Patel's cause of action did not appear to be covered by the anti-SLAPP statute. Because defendants do not specifically argue the order denying their motions should be reversed with respect to Patel's cause of action, we need not address it separately in this appeal. (See *Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1089 ["Since there was no specific claim of error as to the loss of consortium cause of action, we do not reverse the trial court as to this cause of action."].)

# I.

## FACTS AND PROCEDURAL BACKGROUND

### A. *Sujan's Complaint.*

Sujan has been a board certified physician for over 20 years. He had admitting privileges at CRMC and practiced internal medicine there from August 2010 to July 2016. In an introductory paragraph to his complaint, Sujan claimed he was damaged by defendants' "wrongful efforts to harm [his] practice." Defendants' alleged "scheme" included "the filing of false and defamatory internal complaints designed to destroy [Sujan's] professional reputation" and "summarily suspending [his] admitting privileges under false pretenses." Those acts were "intended to unfairly compete with [Sujan] and to convert [his] patients," and they caused him "financial, mental, and emotional injury."

Sujan alleged he provided his patients at CRMC "with a high degree of care and maintained strong professional relationships with his patients and many of his colleagues." His "success [was] well documented" and, according to a data management system used by CRMC "to monitor physician performance," the "mortality rate, readmission rate, and length-of-stay average" for his patients "were much lower than that of his peers." Sujan achieved financial success at CRMC and signed "lucrative contracts" with insurance providers that expanded his practice and placed him in direct competition with Drs. Afifi, Yusufaly, and El-Bershawi, the individual defendants.

According to Sujan, the individual defendants responded to his competition and "growing practice" by "organiz[ing] certain members of the physician staff and registered nursing staff at CRMC" to engage in a "concerted and ongoing" campaign to defame

3

Sujan's reputation through CRMC's peer review process "by falsely depicting him as unresponsive, dilatory, and ill-tempered," with the ultimate goal of having Sujan censured and/or suspended. CRMC abetted and/or conspired with the individual defendants in their campaign to defame Sujan, and it was financially motivated to so because it had an economic interest in recruiting and hiring physicians from EmCare (a healthcare recruiting and staffing company) and ousting physicians like Sujan, who were unaffiliated with EmCare.

Sujan alleged the individual defendants organized members of the physician and nursing staff to file dozens of "MIDAS reports" claiming Sujan "failed to adequately respond to pages and calls he received from the nursing staff." A MIDAS report is a report from a staff member about an alleged violation of CRMC's bylaws and/or state or federal law by a physician. If the director of risk management concludes the report meets CRMC's peer review criteria, it is submitted to the relevant departmental quality review committee (QRC) to determine whether the bylaws or law(s) has been violated and, if so, it is forwarded to CRMC's medical executive committee (MEC) to conduct a peer review and determine whether to restrict, supervise, or revoke the physician's privileges.

According to Sujan, the allegations in the 86 MIDAS reports filed against him were "virtually all fabricated," and "[n]early all of [them] failed to meet the hospital's criteria for review." While auditing the reports, the director of risk management learned of the scheme to defame Sujan and was shocked Sujan was being targeted. Most, if not all, of the reports alleged Sujan did not return calls or pages, but he showed his phone to the director to prove that "on several occasions" he did return calls or pages or he was

4

never called or paged to begin with. And while investigating the matter, the director spoke to nurse managers and was told that "some of the nurses at CRMC were being directed to submit MIDAS reports against [Sujan] based on false and/or misleading allegations."[3]

In June 2016, a patient died of heart failure while under Sujan's care. The patient suffered from various ailments, including a potentially deadly heart condition, and he was a heavy drug user. At the time, Dr. Afifi was chief of staff for the MEC. When Dr. Afifi learned of the death, he convened the MEC and summarily revoked Sujan's admitting privileges "based on its conclusory finding [that] the suspension was necessary to avoid an imminent risk to patients." According to Sujan, Dr. Afifi conducted no investigation to determine whether Sujan committed any wrongdoing, and he declined to conduct an analysis to determine the "root cause" of the patient's death or to interview key witnesses such as Sujan or the head of the intensive care unit (ICU) at the time.

Some of Sujan's colleagues who were familiar with his practice, including the "head of the ICU," were shocked to learn of the summary suspension and wrote letters on his behalf. The patient's insurance provider investigated the death and found no evidence of wrongdoing by Sujan, but no other investigation was conducted. According to Sujan, defendants had no interest in investigating the cause of the patient's death or in determining whether Sujan had committed any wrongdoing. And, once Sujan's

---

**3** Sujan does not expressly allege the director of risk management found *none* of the MIDAS reports met the criteria for peer review and declined to forward *any* of them to the relevant QRC, but that is clearly the implication.

5

privileges were suspended, defendants "converted all of [his] patients" and reassigned them to physicians affiliated with EmCare.

On July 7, 2016, the MEC voted to maintain the summary suspension of Sujan's privileges unless he entered into an agreement establishing the terms and conditions of his reinstatement. The agreement, drafted by Dr. Afifi and the MEC, expressed concerns about (1) Sujan's ability to adequately care for his patients, (2) his failure to respond to requests from nursing staff, (3) his failure to comply with requirements for medical record keeping, and (4) two patients deaths (the patient whose death prompted the summary suspension and another who died two years earlier). Sujan disagreed with the factual basis of his suspension, which was based on false and defamatory MIDAS reports, and he disagreed with the suggestion in the agreement that the patients' deaths were the result of his wrongdoing. However, Sujan believed he had "no reasonable choice" but to sign the agreement because otherwise his summary suspension would have been reported to the "California Medical Board" and the "National Practitioner Data Bank" with potentially ruinous consequences for his medical career. Therefore, he signed the agreement on July 13, 2016. Shortly thereafter, he voluntarily ended his relationship with CRMC.

In the summer of 2017, Sujan was offered a position as a full-time hospitalist with Good Samaritan Hospital, contingent on the hospital verifying his dates of employment at CRMC. After Good Samaritan contacted CRMC for verification, CRMC e-mailed Sujan on August 21, 2017, and told him it would not provide the requested information to Good Samaritan unless Sujan signed an attached release, in which he would agree to release

CRMC from all claims related to its transmission of the verification. Attached to the e-mail from CRMC was also a copy of the verification to be sent to Good Samaritan. In addition to basic employment information requested by Good Samaritan, the verification included a detailed summary of the false and defamatory allegations made in support of Sujan's summary suspension. Sujan refused to sign the release. As of the date of the complaint, CRMC had not transmitted the verification to Good Samaritan, and the status of his offer of employment was in jeopardy.

Sujan alleged he has suffered mental, emotional, and physical injury from defendants' conduct, including depression, strain on his marriage and family relationships, and a heart attack brought on by the stress of his suspension. He also alleged the loss of his patients at CRMC and his contracts with insurance providers has resulted in him losing between $500,000 and $600,000 in annual income, and he has lost opportunities to work at other hospitals.

In a first cause of action for conversion, Sujan alleged the records and protected health information for his patients at CRMC are his personal property, and he invested substantial time, money, and effort into developing the confidentiality and protection of those records. The false and defamatory MIDAS reports filed at defendants' instigation were designed to destroy Sujan's professional reputation and, after Sujan's suspension under false pretenses, defendants "converted [his] business, patient relationships, and patient medical agreements."

Sujan's second cause of action for intentional interference with a prospective economic interest alleged he enjoyed a long-term and mutually beneficial relationship

7

with his patients, of which defendants were aware. The false and defamatory MIDAS reports were designed to destroy Sujan's professional reputation, and defendants summarily suspended his privileges "under false pretenses, with the intent and purpose of terminating [Sujan's] relationship with his patients during his suspension." Defendant succeeded in terminating Sujan's relationship with his patients and caused him economic harm.

The third cause of action for intentional interference with contractual relations alleged Sujan had valid contracts with his patients, of which defendants were aware. Defendants filed false and defamatory MIDAS reports designed to ruin Sujan's professional reputation and summarily suspended his privileges under false pretenses with the intent of inducing a breach of the contracts between Sujan and his patients during his suspension. Defendants succeeded in inducing a breach and/or disruption of the contractual relationship between Sujan and his patients and harmed him economically.

In a fourth cause of action, Sujan alleged defendants conspired and aided and abetted each other in committing the torts alleged in the second and third causes of action.

Sujan's fifth cause of action for defamation alleged the MIDAS reports filed at defendants' instigation claimed Sujan failed to return calls or pages, was unresponsive, and did not adequately attend to his patients' needs and requests. The claims made in the reports were false and resulted in irreparable damage to Sujan's professional reputation among his patients and peers.

8

In his sixth cause of action for IIED, Sujan alleged the individual defendants' conduct in instigating the filing of false and defamatory MIDAS reports, and their act of summarily suspending Sujan's admitting privileges, were outrageous and committed with the express intent to cause, or with reckless disregard for the possibility they would cause, emotional distress. Those acts caused Sujan severe emotional distress, anguish, and anxiety.

Finally, the seventh cause of action alleged "defendants' acts and omissions" toward Sujan caused Sujan's wife (plaintiff Nita Patel) to suffer loss of consortium.

Sujan alleged defendants caused him irreparable and incalculable harm, including loss of reputation and goodwill, and he prayed for injunctive relief to prevent further irreparable harm. In addition to monetary damages according to proof, Sujan alleged defendants conduct was intentional, despicable, and subjected him to unjust hardship and loss with conscious disregard of his rights, and he prayed for punitive damages.

B.     *Anti-SLAPP Motions.*

Defendants filed anti-SLAPP motions in which they argued Sujan's causes of action should be stricken under Code of Civil Procedure section 425.16 because each claim arose from protected activity, to wit, communications made within CRMC's peer review procedures, and Sujan could not establish a probability of succeeding on the merits of his claims.

With respect to the first prong of the anti-SLAPP analysis, defendants contended Sujan's claims were not based on the suspension of his admitting privileges because he had waived his right to sue over his suspension when he entered into the agreement with

9

CRMC to reinstate his admitting privileges. Instead, defendants argued Sujan's claims were based entirely on the allegedly false and defamatory MIDAS reports and other communicative acts by defendants before, during, and after his suspension.

As for the second prong, defendants argued Sujan's causes of action were barred because the communications alleged in the complaint were covered by the common interest and litigation privileges under Civil Code section 47, subdivision (c) and/or because communications made during peer review proceedings are immunized under Civil Code sections 43.7 and 43.8 and under the federal Health Care Quality Improvement Act of 1986 (HCQIA). (42 U.S.C. § 11101 et seq.) In addition, defendants argued Sujan failed to exhaust his administrative and judicial remedies, and he could not establish the elements of his causes of action.

In his oppositions, Sujan argued his causes of action arose from the suspension of his privileges, which is not a protected activity for purposes of the anti-SLAPP statute, so defendants did not satisfy the first prong and the motions should be denied. In addition, he argued intentional false statements made in the MIDAS reports were not legitimate "peer review" conduct and, therefore, were not protected activity. Finally, he argued defendants' defenses all lacked merit so, even if the court were to reach the second prong, the court should find a probability of success on the merits and deny the motions.

C.    *Order Denying Anti-SLAPP Motions.*

In its tentative ruling, which the trial court adopted as its order, the court denied the anti-SLAPP motions. With respect to the first prong of the analysis, the court ruled that, although the first cause of action for conversion "mention[s] defamation and the

10

peer review process," those allegations are incidental to and not the basis for the cause of action. Instead, the court ruled the gravamen of the claim was the taking of Sujan's property, i.e., his patients and their records, and the complaint alleged the takings were accomplished by his wrongful suspension, which is *not* a protected activity. Similarly, the court ruled that, although the complaint mentioned the alleged defamation and the peer review process in the second, third, and fourth causes of action, those claims were all based on defendants' "alleged interference with a contract or with a prospective business dealing." The court concluded "none of the elements of these causes of action depends on the peer review proceedings, statements made during said proceedings or any specific evaluation of [Sujan's] conduct during said proceedings." Because it concluded the gravamen of those causes of action was Sujan's loss of his current and potential future business as a result of his improper suspension, the court ruled the motion failed the first prong of the analysis as to the second through fourth causes of action.

The trial court noted the fifth cause of action for defamation was based on statements made in the context of the peer review process, and it squarely falls within the first prong of the anti-SLAPP analysis. To the extent the sixth cause of action for IIED was based on defamatory statements made in the peer review context, the court ruled the first prong was satisfied. But it ruled the first prong was not satisfied to the extent the IIED claim was based on Sujan's improper suspension.

Addressing the second prong of the analysis, the trial court ruled Sujan had established a probability of prevailing on his cause of action for defamation. Sujan submitted evidence to establish the MIDAS reports were false and to show that

11

defendants had pressured the nursing staff to file the reports, so the statements were attributable to them. Moreover, although the trial court agreed with defendants that Sujan was required to establish malice to overcome the litigation privilege, the evidence Sujan submitted to demonstrate defendants "actively pressured their staff members to file false reports" was prima facie evidence of malice.

The trial court rejected defendants' claims of privilege under Civil Code sections 43.7 and 43.8 and under the federal HCQIA "because the alleged conduct did not occur within the Defendants' role of committee members (pressuring people to make false reports is not part of the Defendants' role as committee members)." The court also rejected the argument that Sujan failed to exhaust his administrative remedies by challenging the suspension of his privileges administratively because his cause of action for defamation *did not* challenge his suspension.

Finally, the trial court ruled Sujan had established a probability of succeeding on the merits of his sixth cause of action for defamation-based IIED. The court ruled: "Attempting to run someone out of business by having your staff submit false MIDAS complaints" constitutes extreme and outrageous conduct, and Sujan's declaration was prima facie evidence he suffered severe emotional distress.

II.

DISCUSSION

A.    *Applicable Law and Standard of Review*.

"The Legislature enacted [Code of Civil Procedure] section 425.16 in response to 'a disturbing increase in lawsuits brought primarily to chill the valid exercise of the

12

constitutional rights of freedom of speech and petition for the redress of grievances.' (§ 425.16, subd. (a).) These lawsuits prompted the Legislature to declare that 'it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.' (*Ibid*.) To limit such risks, the anti-SLAPP legislation provides a special motion to strike 'intended to resolve quickly and relatively inexpensively meritless lawsuits that threaten free speech on matters of public interest.' [Citation.] In 1997, the Legislature amended the statute to provide that, directed to this end, the statute 'shall be construed broadly.' (§ 425.16, subd. (a).)" (*Rand Resources*, *LLC v. City of Carson* (2019) 6 Cal.5th 610, 619.)

The anti-SLAPP statute establishes a "two-prong process for determining whether an action is a SLAPP." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.) The trial court must first determine whether the challenged cause of action arises from an act in furtherance of the federal or state constitutional rights to petition or of free speech in connection with a public issue including, inter alia, written or oral statements made in connection with official proceedings authorized by law. (Code Civ. Proc., § 425.16, subds. (b)(1), (e).) If the court concludes defendant has satisfied his or her burden under the first prong, the cause of action is "subject to" a special motion to strike and must be stricken, "*unless* the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Id*., subd. (b)(1), italics added.)

An order granting or denying an anti-SLAPP motion is appealable. (Code Civ. Proc., §§ 425.16, subd. (i), 904.1, subd. (a)(13).) "We review de novo the grant or denial

of an anti-SLAPP motion. [Citation.] We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity. [Citations.] In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based. (§ 425.16, subd. (b)(2); [citation].) We do not, however, weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).)

> B.   *The Trial Court Properly Denied Defendants' Anti-SLAPP Motions.*

> 1.   *First prong—Sujan's first through fourth causes of action do not arise from protected activity.*

"A claim arises from protected activity when that activity underlies or forms the basis for the claim. [Citations.] Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' [Citations.] '[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.' [Citations.] Instead, the focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' [Citation.] 'The only means specified in section 425.16 by which a moving defendant can satisfy the ["arising from"] requirement is to demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in subdivision (e) . . . .'

14

[Citation.] In short, in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Park*, *supra*, 2 Cal.5th at pp. 1062-1063.)

As they did in their motions, defendants once more contend Sujan's causes of action all arise solely from the peer review process and allegedly false MIDAS reports. Although framed slightly differently, this contention appears to be a restatement of the argument made in their motions that, because Sujan purportedly agreed not to sue when he signed the agreement in exchange for his reinstatement, his claims must be about the peer review process and *not* about the suspension of his admitting privileges.

In the written agreement to reinstate Sujan's admitting privileges, Sujan "waive[d] his right to challenge the Summary Suspension under Section 8.1-4 of the Medical Staff Bylaws," but otherwise reserved his right to "fair procedure rights" under those bylaws. In addition, he agreed "not [to] retaliate, by word or action, against any person who has complained or has participated in the review of complaints concerning him," but reserved the right to "lodge any complaints or grievances" as provided in the bylaws.

Whether the portions of the agreement relied upon by defendants constitute a binding and enforceable waiver of Sujan's right to sue and challenge his suspension relates directly to defendants' *affirmative defenses*, in particular, to the second affirmative defense (breach of agreement) and the thirty-second affirmative defense (waiver). But, arguments about the merits of a cause of action "have no place in our threshold analysis of whether plaintiff[']s] causes of action arise from protected activity." (*Freeman v.*

15

*Schack* (2007) 154 Cal.App.4th 719, 733.)  "Proof that defendant did not commit the alleged acts *or of some legal defense to liability* (e.g., running of the statute of limitations) is *immaterial* to the first prong of the anti-SLAPP analysis—i.e., determining whether plaintiff's claim is based on defendant's protected activities."  (Weil & Brown, Cal. Practice Guide:  Civil Procedure Before Trial (The Rutter Group 2020) ¶ 7:823, p. 7(II)-47, first italics added, second italics in original.)  Therefore, for purposes of the first prong of the analysis, we will not construe the complaint as solely challenging the MIDAS reports.

As Sujan concedes, the trial court correctly concluded his fifth cause of action (defamation) and his sixth cause of action (IIED) arise from protected activity.  Without question, the MIDAS reports are part of CRMC's "peer review" process.  Peer review is an "official proceeding" for purposes of the anti-SLAPP statute, and the filing of MIDAS reports and statements made therein are protected activity for purposes of the first prong analysis.  (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 199-203 (*Kibler*).)  Sujan's cause of action for defamation in toto, and his cause of action for IIED, in part, specifically plead that the loss of his business and professional reputation and his mental distress were directly caused by defendants causing others to file the allegedly false and defamatory MIDAS reports.  There can be no dispute that the MIDAS reports and defendants' conduct formed the basis of and gives rise to those claims.  (*Park*, *supra*, 2 Cal.5th at pp. 1062-1063.)

The same cannot be said of Sujan's first through fourth causes of action. To be sure, Sujan's complaint is peppered with allegations that the MIDAS reports were false and defamatory, and they were designed to harm him. But the mere fact Sujan repeats his claims about the MIDAS reports throughout the complaint (in every cause of action) does not ineluctably lead to the conclusion that every one of his claims is based upon and arises from protected peer review activity. As the Supreme Court explained in *Park*, although *Kibler* held a "peer review" *process* is an "official proceeding," it had no occasion to decide "whether the hospital's peer review *decision* and statements leading up to that decision were inseparable for purposes of the arising from aspect of an anti-SLAPP motion . . . ." (*Park*, *supra*, 2 Cal.5th at p. 1069, italics added.) "*Kibler* does not stand for the proposition that *disciplinary decisions* reached in a peer review process, as opposed to statements in connection with that process, are protected." (*Park*, at p. 1070, italics added.) As the court further explained in *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871 (*Wilson*), "[t]he anti-SLAPP statute does not apply simply because an employer protests that its personnel decisions followed, or were communicated through, speech or petitioning activity." (*Id*. at p. 890.) Instead, the defendant "must

show that the complained-of *adverse action*, in and of itself, is an act in furtherance of its speech or petitioning rights."[4] (*Ibid.*, italics added.)

Sujan's first cause of action for conversion requires him to prove, inter alia, that defendants converted his personal property by a wrongful act or disposition of property rights. (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1240.) Sujan alleged defendants caused the false and defamatory MIDAS reports to be filed as part of their design to ruin his professional reputation then summarily suspended his admitting privileges under false pretenses. Although the filing of the MIDAS reports was part of defendants' overall "scheme," and it was a necessary step in defendants' alleged plan to ruin Sujan and take his patients, the operative conduct for purposes of the tort of conversion was the

---

[4] During oral argument, defendants brought to this court's attention the decision in *Bonni v. St. Joseph Health System* (2017) 13 Cal.App.5th 851, review granted November 1, 2017, S244148. The court there reversed an order granting an anti-SLAPP motion in a whistleblower retaliation lawsuit brought by a physician. (*Id.* at pp. 854-855.) Applying *Park*, the court held the physician's cause of action arose from the hospital's retaliatory purpose and motive behind the suspension of and denial of his admitting privileges, and not from the "act of initiating and pursuing the peer review process, or on statements made during those proceedings . . . ." (*Bonni*, at p. 863.) To the extent *Bonni* held retaliatory motives can be separated from adverse employment actions, for purposes of avoiding the anti-SLAPP statute, the California Supreme Court disapproved of it. (*Wilson*, *supra*, 7 Cal.5th at p. 892.)

In addition, the California Supreme Court granted review in *Bonni* and will decide "[t]o what extent, if any, is the initiation and conduct of medical peer review proceedings protected activity under the anti-SLAPP statute?" (Issues Pending Before the Cal. Supreme Ct. in Civ. Cases (Feb. 26, 2021), available at <https://www.courts.ca.gov/documents/FEB2621civpend.pdf> [as of Mar. 8, 2021].)

Unless and until the California Supreme Court holds that the ultimate *decision and action* taken by a medical review committee (like the peer review *process*) is itself an act in furtherance of a hospital's free speech or petitioning rights, we are bound by the decision in *Park*, *supra*, 2 Cal.5th 1057 and will apply it here. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["The decisions of this court are binding upon and must be followed by all the state courts of California"].)

suspension itself. Sujan alleged: "*During Plaintiff's suspension*, Defendants converted Plaintiff's business, patient relationships, and patient medical agreements." (Italics added.) In other words, whereas the MIDAS reports themselves are the basis of Sujan's alleged harm in his defamation and IIED claims, they are not the conduct that directly and necessarily resulted in the conversion of his business and patient relationships.[5]

So too with Sujan's second and third causes of action. The causes of action for intentional interference with a prospective economic advantage and for intentional interference with a contractual relationship have very similar elements. Relevant here, both causes of action require Sujan to prove defendants intentionally committed an act designed to disrupt his economic relationship and contracts with his patients and with insurance providers, and that those acts resulted in an actual disruption of those relationships and contracts to Sujan's economic detriment. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 [elements for tort of intentional interference with prospective economic advantage]; *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [elements for tort of intentional interference with a contractual relationship].)

Like his conversion claim, Sujan alleged the false and defamatory MIDAS reports were a necessary step in defendants' design, but he also alleged the specific conduct that

---

[5] Defendants argue the first cause of action is for "conversion in name only" because, when Sujan's admitting privileges were summarily suspended, his patients were merely *reassigned* to other physicians, and Sujan's patients and patient records were not his personal property to begin with. But whether Sujan can prove the elements of the tort of conversion goes to the merits, and it is not a question we may reach on the first prong of the anti-SLAPP analysis. (*Freeman v. Schack*, *supra*, 154 Cal.App.4th at p. 733.)

directly gives rise to his claims—the wrongful act that disrupted and interfered with his economic advantage and contracts—was the *suspension* of his admitting privileges. In the second cause of action, Sujan specifically alleged defendants "summarily suspended [his] admitting privileges under false pretenses, with the intent and purpose of terminating [his] relationship with his patients during his suspension," and "[d]efendants succeeded in terminating [his] relationship with his patients." Similarly, in the third cause of action, Sujan specifically alleged defendants "summarily suspended [his] admitting privileges under false pretenses, with the intent and purposes of inducing a breach of or disrupting the contractual relationship between [him] and his patients during his suspension," and "[d]efendants have succeeded in creating a breach and/or disruption of [his] contractual relationship with his patients."

Finally, the trial court correctly concluded Sujan's fourth cause of action for conspiracy does not arise from protected activity. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.) Sujan alleged defendants conspired to commit the torts alleged in the second and third causes of action. Because those underlying claims do not themselves arise from protected activity, the same is true for the conspiracy.

*2. Second prong—Sujan has a probability of succeeding on his fifth and sixth causes of action.*

Our Supreme Court has described the second prong of the anti-SLAPP analysis "'as a "summary-judgment-like procedure."'" (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940.) "The plaintiff need not prove her case to the court [citation]; the bar sits lower, at a demonstration of 'minimal merit' [citation]. At this stage, '"[t]he court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law."'" (*Wilson*, *supra*, 7 Cal.5th at p. 891.) We must draw all reasonable inferences from a plaintiff's evidence and may not conclude the trial court should have granted the motion simply because conflicting inferences may be drawn from a defendant's evidence. (*Kinsella v. Kinsella* (2020) 45 Cal.App.5th 442, 462.)

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.'" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.) In the complaint, Sujan alleged defendants, as part of a concerted campaign to defame and ultimately run him out of the hospital and take his business, caused MIDAS reports to be filed, which falsely depicted him as "unresponsive, dilatory, and ill-tempered," and falsely accused him of not adequately responding to his patient's needs.

21

To support those allegations, Sujan submitted the declaration of a colleague, Aimee French, M.D., who stated she personally became aware that a group of doctors at CRMC, and nurses encouraged by those doctors, targeted both her and Sujan by repeatedly spreading false accusations and filing meritless MIDAS reports.[6] And Holly Ramos, CRMC's "Director of Quality, Patient Experience, Patient Safety, and Risk Management" at the time of the alleged acts, declared she had audited 86 MIDAS reports submitted about Sujan. She concluded the majority of them did not meet CRMC's criteria for peer review and many were "petty or simply unworthy of consideration." Ms. Ramos declared the MIDAS reports that accused Sujan of failing to return phone calls or pages "were fabricated." Based on her personal observations, Ms. Ramos declared she believed Dr. Yusfaly had encouraged the filing of false MIDAS reports, and all three individual defendants used the reports and the peer review process to unfairly target Sujan "for reasons wholly unrelated to his professional practice."

This evidence, which we must credit for purposes of an anti-SLAPP motion, makes a prima facie case that defendants encouraged nursing and other staff members to file false and defamatory MIDAS reports. Although defendants did not themselves file the reports or make the statements contained therein, the evidence and reasonable inferences to be drawn from it make a sufficient case that defendants aided and abetted in the filing of statements, which defendants and staff members knew to be false. Defendants challenge the specificity of the evidence by asking: "Who are the staff

---

[6] Like the trial court, we need not consider Sujan's evidence to which defendants interposed objections.

22

members [pressured to file MIDAS reports] and which Defendant encouraged them? Which Defendant knew a report was false and what did the report consist of? How is the report false? What evidence is there that staff members were pressured?" But, because Sujan has shown his defamation claim has *minimal merit*, those and other questions are better left for another day, after the evidence has been fully developed.

Finally, "The elements of a cause of action for intentional infliction of emotional distress are (i) outrageous conduct by defendant, (ii) an intention by defendant to cause, or reckless disregard of the probability of causing, emotional distress, (iii) severe emotional distress, and (iv) an actual and proximate causal link between the tortious conduct and the emotional distress." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 300.) To repeat, Sujan's IIED claim is based upon the same conduct alleged in his defamation claim. Again, Sujan's evidence (that we must accept as true) and the reasonable inferences drawn from it are sufficient to survive defendants' anti-SLAPP motion. Knowingly encouraging and/or pressuring others to submit false MIDAS reports, in an effort to railroad a physician and take his business, would support the conclusion of a trier of fact that defendants' conduct was outrageous and, at a minimum, was done with conscious disregard of causing Sujan extreme emotional distress.

a. Exhaustion of administrative and judicial remedies.

Defendants argue Sujan is nonetheless unable to establish a probability of succeeding on the merits of his causes of action because he failed to exhaust his administrative and judicial remedies and, therefore, the peer review decision that resulted

in his suspension constitutes a bar under the doctrines of res judicata and collateral estoppel. Because we have already concluded the first through fourth causes of action do not arise from protected activity, we need only address this and the remainder of defendants' arguments as they apply to Sujan's defamation and related IIED claims.

Article VIII of CRMC's bylaws is entitled "Hearing and Appellate Reviews." Section 8.1-5 requires all "members . . . to exhaust all remedies provided in this Article or elsewhere in medical staff bylaws, rules and regulations or policies before initiating legal action." A member who fails to exhaust his or her remedies is liable to pay costs and fees expended to respond to the action. In addition, section 8.1-8 provides: "Recommended adverse actions described in Section 8.2 shall become final only after the hearing and appellate rights set forth in these bylaws have either been exhausted or waived, and only upon being adopted as final actions by the Governing Board of Directors." In turn, section 8.2 provides that an administrative hearing may be requested about a list of completed or recommended adverse actions, including "summary suspension of staff membership or staff privileges for greater than 14 days."

Defendants rely heavily on *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, but that case only stands for the proposition that a physician must exhaust his *available* administrative remedies as provided in a hospital's bylaws. (*Id*. at pp. 474-477.) If the bylaws do not provide a remedy for the physician's claims, he or she need not exhaust the nonexistent remedy. Here, CRMC's bylaws require exhaustion of administrative remedies to challenge the *suspension* of admitting privileges, but they do not provide a means of challenging defamation made before, during, or after the peer

review process, which does not result in an adverse decision. To repeat, we have already concluded Sujan's claims about his suspension do not arise from protected activity, so whether his failure to exhaust administrative remedies under the bylaws is a bar to *those claims* is a question for another day.

True, Sujan could have tested the veracity of the MIDAS reports in the context of an administrative hearing challenging his suspension, but the precise question before us is whether he was required to initiate such a proceeding specifically to vindicate his right against being defamed. Because defendants' exhaustion and res judicata/collateral estoppel arguments focus solely on the suspension-based claims, and defendants point to nothing in the bylaws that would provide for exhaustion of Sujans' defamation claim, we conclude for the limited purposes of the second prong of the anti-SLAPP analysis that Sujan has established a probability he was not required to exhaust his administrative and judicial remedies as to his defamation and IIED claims.

### b. Contractual waiver.

Defendants also contend Sujan waived his right to sue when he signed the agreement to reinstate his admitting privileges. For the reasons stated, *ante*, to the extent this argument is made in the context of trying to limit the scope of Sujan's complaint challenging the MIDAS reports, we do not consider it with respect to the first through fourth causes of action. As for the defamation and IIED claims, the argument is unpersuasive.

To repeat, defendant agreed to waive his right to challenge his suspension through the administrative hearing process under the bylaws and agreed not to "retaliate" against

25

anyone who complained about him or participated in the peer review process that resulted in his suspension. In the two paragraphs they devote to this argument in their opening brief, defendants cite no authority to support the ipse dixit that "[t]he entire action was clearly a *retaliation*" against defendants "for assisting or encouraging Hospital personnel to submit MIDAS reports against Sujan." Defendants attempt to flesh out this argument in their reply brief, but beyond discussing general principles of contract interpretation, they cite nothing to support the conclusion that "retaliate" in the agreement meant filing a lawsuit.

We must interpret the relevant language of the agreement with an eye to giving effect to the parties' mutual intent. (Civ. Code, §§ 1646-1648.) Unless the parties agreed otherwise, we must give the words of a contract "their ordinary and popular sense" instead of their "strict legal meaning" or "technical sense." (*Id*., § 1644; see *id*., § 1645.) We may consider the circumstances under which a contract is made when interpreting its language and provisions. (*Id*., § 1647.) Where the credibility of extrinsic evidence is not at issue, contract interpretation is a question of law we review de novo. (*Bear Creek Master Assn. v. Southern California Investors*, *Inc*. (2018) 28 Cal.App.5th 809, 819.)

The agreement itself does not define the term "retaliate," and its ordinary and popular meaning does not necessarily include litigation. Nor is such a meaning dictated by the language of the agreement or the context of its creation. In exchange for reinstatement of his privileges, Sujan agreed to abide by the bylaws and rules. Among other things, he agreed to adopt best practices so "hospital staff will be able to contact him without delay." Considering the MIDAS reports included numerous complaints

26

from nursing staff that Sujan did not return calls and pages, it is reasonable to conclude the agreement sought to insulate nurses and other staff who made the complaints and anyone who may have pressured staff to make the complaints from any retaliation by Sujan *in the workplace*. In addition, because the agreement expressly reserved Sujan's right to lodge formal complaints and grievances, we are not convinced that, by agreeing to not retaliate against anyone involved in the peer review process, he agreed not to pursue legal avenues of redress.

           c. Absolute immunity under the litigation privilege. (Civ. Code, § 47).

Next, defendants argue the allegedly false and defamatory MIDAS reports are protected by the litigation privilege. True enough, hospital peer review is a quasi judicial, official proceeding for purposes of the litigation privilege. (Civ. Code, § 47, subd. (b); *Kibler*, *supra*, 39 Cal.4th at p. 202.) Also true, statements made in anticipation of litigation or in anticipation of an official proceeding are at least potentially privileged. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1194-1195.) But, defendants fail to recognize an important limitation on the privilege: "A prelitigation communication is privileged only when it relates to litigation that is contemplated *in good faith* and under serious consideration." (*Action Apartment Assn.*, *Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*), italics added.)

"The policy supporting the litigation privilege is furthered only if litigation is seriously considered: 'It is important to distinguish between the lack of a good faith intention to bring a suit and publications which are made without a good faith belief in their truth, i.e., malicious publications. The latter, when made in good faith anticipation

27

of litigation, are protected as part of the price paid for affording litigants the utmost freedom of access to the courts.  This policy consideration is not advanced, however, when the person publishing an injurious falsehood is not seriously considering litigation.  In such a case, the publication has no "connection or logical relation" to an action and is not made "to achieve the objects" of any litigation [citation].  No public policy supports extending a privilege to persons who attempt to profit from hollow threats of litigation.'" (*Action Apartment*, *supra*, 41 Cal.4th at p. 1251.)

"Whether a prelitigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact."  (*Action Apartment*, *supra*, 41 Cal.4th at p. 1251.)  When there is a factual dispute whether prelitigation communication was made in actual contemplation of litigation, *and with the good faith intention to resolve a dispute*, application of the privilege should not be resolved on summary judgment or a similar motion.  (*Eisenberg v. Alameda Newspapers*, *Inc.* (1999) 74 Cal.App.4th 1359, 1380-1381, cited with approval in *Action Apartment*, at pp. 1251-1252.)  Sujan submitted evidence in opposition to the anti-SLAPP motions that, if credited by a trier of fact, would support the reasonable inference that the MIDAS reports were *not* filed with the good faith intention to resolve a genuine dispute with Sujan, but were filed with the express intention of ruining his professional reputation and running him out of the hospital.  Therefore, we conclude Sujan has established a reasonable probability that the litigation privilege does not bar his defamation and IIED claims.

d. Qualified immunity under HCQIA.

Defendants also argue they are immunized by the federal HCQIA. That statute "provides immunity from money damages for peer review actions taken in compliance with the statute's requirements . . . ." (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 988; see 42 U.S.C. § 11111(a)(1).) If a hospital's professional review body complies with the statute's dictates when it takes "a professional review action," the body itself, persons acting as a member or staff of that body, persons acting under contract or other formal agreement with the body, and persons who participate with or assist the body with respect to the action, are immune from liability for damages "*with respect to the action.*" (42 U.S.C. § 11111(a)(1)(A)-(D), italics added.)

A "'professional review action'" is defined as "an action or recommendation" by the professional review body about a physician's competence or professional conduct that adversely affects or may adversely affect the physician's clinical privileges, such as suspension of those privileges.[7] (42 U.S.C. § 11151(9).) Professional review action does not, however, include communications made to the professional review body by persons who are not members of or otherwise affiliated with the professional body. For those persons, the HCQIA provides: "Notwithstanding any other provision of law, no person (whether as a witness or otherwise) providing information to a professional review body

---

[7] Because we have already concluded Sujan's causes of action challenging his suspension do not arise from protected activity, we have no occasion here to decide whether those claims are barred by the HCQIA.

29

regarding the competence or professional conduct of a physician shall be held, by reason of having provided such information, to be liable in damages under any law of the United States or of any State (or political subdivision thereof) unless such information is false and the person providing it knew that such information was false." (*Id*., § 11111(a)(2).)

As noted, Sujan's complaint does not allege CRMC or the individual defendants themselves submitted the allegedly false and defamatory MIDAS reports, but that they encouraged and/or coerced members of the physician and nursing staff to do so. Therefore, as the trial court correctly noted, Sujan's cause of action for defamation and his related IIED claim are only viable under an aiding and abetting theory. Even assuming for purposes of this appeal the qualified immunity under 42 United States Code section 11111(a)(2) applies to someone who encourages and/or aides and abets in the communication of false and defamatory information to a professional review board, we conclude Sujan made a prima facie case to defeat that immunity by submitting evidence defendants encouraged and/or pressured hospital and nursing staff to submit MIDAS reports the staff members knew to be false.

e. Qualified immunity. (Civ. Code, §§ 43.7, 43.8.)

In addition, defendants argue they are entitled to immunity under Civil Code sections 43.7 and 43.8.

Civil Code section 43.7 provides qualified immunity to acts taken by a member of a committee of a hospital's professional staff when those acts are "performed within the scope of the functions of the committee," and the member "acts without malice, has made a reasonable effort to obtain the facts of the matter as to which he, she, or it acts, and acts

30

in reasonable belief that the action taken by him, her, or it is warranted by the facts known to him, her, it after the reasonable effort to obtain facts." (Civ. Code, § 43.7, subd. (b).)

Section 43.8 of the Civil Code immunizes "any person on account of the communication of information in the possession of that person to any . . . peer review committee . . . when the communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner of the healing or veterinary arts." (Civ. Code, § 43.8, subd. (a).) But the immunity is qualified, and "proof that the communicator knew the information to be false when it was conveyed establishes malice sufficient to defeat [it]." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 723; see Civ. Code, § 43.8, subd. (c).)

The trial court ruled the immunity under Civil Code section 43.7 (the court misstated it as § 43.8) did not apply because the individual defendants' alleged conduct did not occur in the course and scope of their roles as members of the peer review committee. We need not address whether that reasoning was flawed, as defendants contend, because the evidence supports a finding of malice. (See *Gruber v. Gruber* (2020) 48 Cal.App.5th 529, 542 ["Because we independently review a trial court's resolution of an anti-SLAPP motion, we review only its result, not its reasoning."].) To repeat, Sujan's evidence and the reasonable inferences we must draw from it make a prima facie case that defendants knew or reasonably should have known the statements they encouraged others to make were false.

31

f. Confidentiality of peer review records.  (Evid. Code, § 1157, subd. (a).)

Finally, defendants argue Sujan cannot succeed on his defamation and IIED causes of action because Evidence Code section 1157, subdivision (a) prohibits him from introducing the MIDAS reports into evidence.  But defendants did not raise this purported defense in their motions, and the trial court had no occasion to rule on it in the first instance.  Therefore, the argument has been forfeited for purposes of this appeal.  (*RGC Gaslamp*, *LLC v. Ehmcke Sheet Metal Co*., *Inc*. (2020) 56 Cal.App.5th 413, 431, 434 [declining to address "'entirely new arguments'" made on appeal to challenge order granting anti-SLAPP motion].)

## III.

## DISPOSITION

The order denying defendants' anti-SLAPP motions is affirmed.  Sujan shall recover his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER          
                    Acting P. J.

We concur:


MILLER          
          J.


RAPHAEL        
          J.